

**SO ORDERED,**

**Judge Jason D. Woodard**

**United States Bankruptcy Judge**

**The Order of the Court is set forth below. The case docket reflects the date entered.**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF MISSISSIPPI

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| IRA JOHNNY HARBER, | ) | Case No.:   11-15900-JDW |
| | ) | |
| Debtor. | ) | Chapter 11 |

| | | |
|---|---|---|
| RENASANT BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | A.P. No.:   12-01107-JDW |
| | ) | |
| IRA JOHNNY HARBER, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This adversary proceeding is before the Court on the *Complaint to Determine Dischargeability* (Dkt. # 1) filed by creditor-plaintiff Renasant Bank (the "Plaintiff") against debtor-defendant Ira Johnny Harber (the "Defendant"). A trial on the adversary proceeding was held on March 31, 2015, at which time a

1

representative of the Plaintiff, Scott Williams, counsel for the Plaintiff, Scott Hendrix, and the Defendant all appeared. The Defendant appeared *pro se* after being afforded several opportunities to obtain counsel. The Plaintiff seeks a determination that debts owed by the Defendant are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), (a)(4) and/or (a)(6). This Court finds and concludes that the Plaintiff has carried its burden as to § 523(a)(2)(B) and that the Defendant's debts to Plaintiff are nondischargeable.

At trial, arguments were heard and documents were received into evidence, either upon stipulation of the parties or without objection by either party. The Court also heard testimony from the Defendant and several other witnesses for the Plaintiff, including John Castleberry, a former loan officer responsible for Defendant's loans, and Tom Floyd, Booneville market president for Plaintiff. At the conclusion of the Plaintiff's case, the Defendant chose to rest without calling any witnesses. The Court explained to the Defendant that he had the opportunity to present argument and evidence of his own,[1] and/or to call certain witnesses to the stand. The Defendant acknowledged that he understood the options available to him at trial, but confirmed his intention to rest.

## I.   JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 151, 157(a) and 1334(b) and the United States District Court for the Northern District of Mississippi's

---

[1] The Defendant did cross-examine Plaintiff's witnesses.

Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc Dated August 6, 1984. This is a core proceeding arising under Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(I) and (O).

## II.   FINDINGS OF FACT[2]

The Plaintiff is a Mississippi bank. The Defendant, a contractor, has an extensive loan history with the Plaintiff, having used the Plaintiff to finance multiple projects over the course of several years. Presently at issue are several notes the Defendant executed with the Plaintiff, all relating to financing for two construction projects – (1) a shopping center in Iuka, Mississippi ("Battleground Plaza"), and (2) a house in Waterloo, Alabama (the "Waterloo Property"). The underwriting for the loans stemming from Battleground Plaza and the Waterloo Property are central to this adversary proceeding.

### A. Battleground Plaza

Between 2006 and 2008, the Defendant executed four promissory notes, payable to the Plaintiff, for funds loaned for a retail strip mall project known as Battleground Plaza. The loans were made on the following dates in the following amounts:

1. December 26, 2006, in the amount of $140,553.00;
2. May 31, 2007, in the amount of $298,017.00;
3. December 7, 2007, in the amount of $545,355.55; and
4. May 7, 2008, in the amount of $667,154.00.

---

[2] To the extent any of the findings of fact are considered conclusions of law, they are adopted as such. To the extent any of the conclusions of law are considered findings of fact, they are adopted as such.

(collectively, the "Battleground Loan").   The promissory notes evidencing the Battleground Loan each evidence a renewal and increase from the prior note.  As security for the Battleground Loan, the Defendant executed and delivered a deed of trust, granting the Plaintiff a first lien on Battleground Plaza, as well as an assignment of rents and leases.

With financing secured, the Defendant began construction on Battleground Plaza.  However, by May, 2008, the Defendant had fully drawn all funds from the Battleground Loan.  By the time the last draw was made, the Defendant still required an additional $100,000.00 to complete the project before it would be ready for commercial lessees to move into the property.  The Battleground Plaza was eventually completed by diverting loan proceeds from the Waterloo Property.

## B. The Waterloo Property

In August, 2007, the Defendant approached the Bank with a plan to purchase and renovate a lake home in Waterloo, Alabama that had been damaged in a fire.  The Defendant proposed to buy, renovate, and then sell the property. The Plaintiff accepted the Defendant's plan and proposal for the Waterloo Property, and agreed to extend the requested loan.  On August 21, 2007, the Defendant executed and delivered to the Plaintiff a promissory note in the amount of $191,580.00 for the Waterloo Property (the "First Waterloo Note") along with a mortgage securing the loan (Ex. P-5).  The First Waterloo Note established a

construction loan allowing for multiple draws.    By March 3, 2008, the Defendant
had fully drawn on the Waterloo Note.

In August, 2008, Plaintiff advanced additional funds and the Defendant
delivered a second promissory note to the Plaintiff (the "Second Waterloo Note") in
the original principal amount of $321,658.91, along with a second mortgage
(together with first mortgage, the "Mortgage") to secure the increased loan.    The
Defendant also submitted other statements, plans, budgets and other documents,
upon which the Plaintiff relied in underwriting the Second Waterloo Note.    At the
time the Second Waterloo Note was executed, however, the Defendant had no
intention of putting the funds into the Waterloo Property.    Instead, it was the
Defendant's intention to divert the funds from the Waterloo Property into
Battleground Plaza.

The Defendant, in fact, did not use the funds from the Second Waterloo Note
on the Waterloo Property, and as a result, the Waterloo Property was never
completed.    When the Defendant eventually defaulted on the notes, the half-
completed Waterloo Property was worth considerably less than it would have been
if completed.    The Plaintiff eventually foreclosed the Mortgage.

C. **Personal Financial Statements**

To support the underwriting of the various loans, the Defendant prepared
and submitted to the Plaintiff two separate personal financial statements.    The
first personal financial statement was executed on November 7, 2006, and the

5

second statement was executed on November 13, 2007. (Collective Ex. P-25)(together, the "Financial Statements"). The Defendant prepared the Financial Statements himself and did so with the knowledge that they would be used by the Plaintiff in underwriting the loans.

Although not apparent to the Plaintiff at the time of delivery, the First and Second Financial Statements turned out to contain both inaccurate and completely false information. The most glaring of these fabrications is the inclusion of an entry for "Harber Enterprises" (valued at $800,000.00) – an entity that did not then, nor has it ever, existed. The Financial Statements also included entries for various parcels of real property, all listed as being unencumbered with considerable value. The approximate market values for those items were not based on any actual evidence or appraisals, but were simply the Defendant's own creations.

## D. Foreclosure and Resulting Litigation

By February, 2008, the Defendant had defaulted in his payments of the Waterloo Notes and Mortgage. (Ex. P-33). At that time, the principal balance on the loan was $321,658.91 (the full commitment amount), while only 40-50% of the construction was complete.

Through the spring and summer of 2009, the parties discussed the possibility of the Defendant pledging additional collateral in exchange for additional time to complete the project. No such deal was consummated, however,

and on December 16, 2009, the Plaintiff foreclosed on the Mortgage. The foreclosure sale of the Waterloo Property brought a purchase price of $132,000.00. (Ex. P-41, Mortgage Foreclosure Deed). There remained a deficiency balance due under the Second Waterloo Note of $231,954.19 (as of September 27, 2010; *see* A.P. Case No. 12-01029, Dkt. # 24).

The Defendant also eventually defaulted on the Battleground Loan. (Ex. P-44). On October 4, 2010, the Plaintiff filed suit against the Defendant in the Chancery Court of Tishomingo County, Mississippi, seeking judicial foreclosure of the abovementioned Deeds of Trust relating to the Battleground Plaza, and to be allowed to include the deficiency relative to the Second Waterloo Note as part of its first lien on the Battleground Plaza (the "Chancery Court Case")(*see* A.P. Case No. 12-01029, Dkt. # 1). On December 29, 2011, the Defendant filed the bankruptcy case, thus temporarily halting the Chancery Court Case. On March 16, 2012, the Plaintiff filed its Notice of Removal (A.P. Case No. 12-01029, Dkt. # 1), commencing the first adversary proceeding between these two parties in this Court (the "First Adversary Proceeding").[3]

The Defendant failed to timely defend or otherwise participate in the First Adversary Proceeding, thereby resulting in an Entry of Default and a Default Judgment (A.P. Case No. 12-01029, Dkts. #8 and 24) in favor of the Plaintiff. In that First Adversary Proceeding, this Court entered a final judgment for

---

[3] The Honorable David W. Houston, III presided over the First Adversary Proceeding.

$834,344.29, excluding costs of collection and future accruing interest.[4] Battleground Plaza was eventually foreclosed, fetching a price of $275,001.00. (Ex. P-56).

On October 1, 2012, the Plaintiff commenced this current adversary proceeding, seeking declaration from this Court that the debts owed to it by the Defendant are nondischargeable.

## III.   CONCLUSIONS OF LAW

Plaintiff asserts that the debt owed by the Defendant is nondischargeable pursuant to § 523(a)(2)(A), (a)(2)(B), (a)(4) and/or (a)(6). If the Court finds that the debt is nondischargeable under any one of the four subsections, it will obviate the need to explore the applicability of the other three subsections. Accordingly, it is in the best interest of judicial economy to begin with an analysis of § 523(a)(2)(B) – the only subsection that the Plaintiff asserts applies to both of the loans.

Section 523(a)(2)(B) excepts from discharge those debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by use of a statement in writing—

> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive

---

[4] The Default Judgment, now final and non-appealable, ordered that interest on the debt would continue to accrue at the contract rate.

11 U.S.C. § 523(a)(2)(B).  The Plaintiff bears the burden of proof of establishing, by a preponderance of the evidence, that the debts in question should be excepted from discharge.  *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991).

## A. Materially False Statement

"[A] materially false statement is one that paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit."  *Byrd v. Bank of Miss.,* 207 B.R. 131, 136 (S. D. Miss. 1997)(citing *Jordan v. Southeast National Bank (Matter of Jordan),* 927 F.2d 221, 224 (5th Cir. 1991) (*overruled in part by Coston v. Bank of Malvern (Matter of Coston),* 991 F.2d 257 (5th Cir. 1993))).

The material falsities contained in the Defendant's First and Second Financial are not subject to debate.  The Defendant testified at trial that certain assets listed on both financial statements do not now, nor have they ever existed. Most notably, there is the entry for "Harber Enterprises," valued at $800,000.00. The Defendant – who individually prepared both financial statements – testified at trial that there was no such entity, that there never had been, and that he did not know to what company the entry was referring.

Further, even the actual, existing assets listed on the First and Second Financial Statements were significantly overvalued.  In the First Financial

Statement, Defendant represented that he owned 2 pieces of unencumbered real property – 3 acres at Indian Creek and 110 acres of lake property – worth $840,000.00. By the time the Second Financial Statement was executed a year later, the Defendant increased the value of those pieces of property to $905,000.00. At trial, the Defendant testified that he had no basis for valuations on either the First or Second Financial Statements. He further testified that no work had been done on the properties between the First and Second Financial Statements so that their values would have increased. Furthermore, when the Defendant eventually filed for bankruptcy, his amended schedules showed that he did not actually own the 110 acres, but that it was owned by JMDV Properties, LLC. The property was eventually sold for only $25,000.00. Not only was the property significantly overvalued, but the Defendant not actually own the property, in spite of his representations to the Plaintiff.

At trial, the Defendant attempted to explain the decrease in property values (most importantly, the 110 acres) on a downturn in the economy. While the Court can appreciate the depreciation in real property values around 2008, that downturn cannot explain such a significant decrease in values. The Court finds that the complete fabrication of an asset alleged to be worth such a considerable amount, coupled with the over-exaggerated values of existing assets, goes far beyond the category of puffery.

Further, the Defendant testified that he was aware that the Financial Statements would be used by the Plaintiff in its decision-making process and as a means of gauging whether or not to extend credit for the loans. The Defendant also freely admitted that at the time he prepared and applied for an extension of credit, he intended to divert the proceeds from one project to another. Accordingly, not only was the information contained within the Financial Statements materially false, but so was the purpose and intent behind submitting the second Financial Statement.

The Court finds that the Defendant presented the Plaintiff with a substantially untruthful picture of his financial condition. A review of the Financial Statements would lead one to believe that the Defendant owned an unencumbered asset worth almost one million dollars, as well as a corporate entity valued at $800,000.00, of which the Defendant was the sole owner. A financial statement is considered materially false – within the meaning of § 523(a)(2)(B) – if it contains "substantially untruthful information of a type which normally would bear on the Bank's credit making decision." *In re Robinson*, 192 B.R. 569, 576 (Bankr. N.D. Ala. 1996). Mr. Castleberry explicitly testified at trial that he extended credit based on (in large part) the seemingly sound Financial Statements, and the sorts of falsehoods contained within the Financial Statements are of the type that would have a bearing on the Plaintiff's decision to extend credit.

11

## B. Concerning Debtor's Financial Condition

As to the question of whether or not the writing concerns a debtor's financial situation, the Fifth Circuit has explained that the term "financial condition" is "meant to embody terms commonly understood in commercial usage rather than a broadly descriptive phrase intended to capture any and all misrepresentations that pertain in some way to specific assets or liabilities of the debtor." *In re Bandi,* 683 F.3d 671, 676 (5th Cir. 2012). The term "means the general overall financial condition of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities." *Id.*

The very purpose of these sorts of financial statements it to provide a lender with the type of information it would need to assess the overall financial condition of a borrower before deciding to extend a loan. At trial, the Defendant also testified that he was aware that this was the purpose of compiling and providing the Financial Statements. In short, Financial Statements are of the type specifically designed to paint a picture of the individual's financial condition – detailing their assets and liability and conveying to a lender what sort of financial security a borrower possesses. There is no doubt that the First and Second Financial Statements concern the Debtor's financial condition (or alleged condition as the case may be).

## C. Reasonably Relied

The Fifth Circuit has held that reasonableness of reliance under §

523(a)(2)(B) is a factual determination to be made in light of the totality of the

circumstances. *Coston,* 991 F.2d at 261 (citation omitted).

> The bankruptcy court may consider, among other things: whether
> there had been previous business dealings with the debtor that gave
> rise to a relationship of trust; whether there were any "red flags" that
> would have alerted an ordinarily prudent lender to the possibility that
> the representations relied upon were not accurate; and whether even
> minimal investigation would have revealed the inaccuracy of the
> debtor's representations.

*Id.* "However, before making a determination on whether the reliance was

reasonable, the court must first determine whether the reliance was actual." *In re*

*Trimble*, 482 B.R. 546, 555 (Bankr. N.D. Miss. 2012).

> To establish actual reliance, the creditor must show its reliance on the
> false financial statement was "a contributory cause of the extension of
> credit and that credit would not have been granted if the lender had
> received accurate information." Although actual reliance must be
> demonstrated, a creditor does not have to show that it relied
> exclusively on the false financial statement. It is sufficient if the
> creditor establishes that it partially relied on the false statement.

*Colo. E. Bank & Trust v. McCarthy (In re McCarthy),* 421 B.R. 550, 560–61

(Bankr. D. Colo. 2009) (internal footnotes omitted).

In short, this element of § 523(a)(2)(B) is in fact a two-part consideration: (1)

whether or not the creditor actually relied on the information in question, and (2)

whether or not the creditor's reliance was objectively reasonable. *See, e.g., In re*

*Trimble*, 482 B.R. at 555; *In re Cohn,* 54 F.3d 1108, 1117 (3rd Cir. 1995)("[t]he

13

reasonableness of a creditor's reliance under § 523(a)(2)(B) is judged by an objective standard…").

### 1. Actual Reliance

The first Financial Statement had been prepared by the Defendant to support his request for financing for Battleground Plaza.  John Castleberry, a former loan officer for the Plaintiff, testified at trial that he had worked with the Defendant in the past, knew him to be a competent developer, and that any prior loans extended to the Defendant had always been paid in full.  Mr. Castleberry further testified that his positive financing history with the Defendant, coupled with the seemingly sound first Financial Statement, supported the decision to extend financing for the Battleground Plaza.

Similarly, when the Defendant approached the Plaintiff requesting further financing, the Plaintiff based its decision to extend that financing off of the Defendant's apparently firm financial footing as portrayed through the second Financial Statement. Mr. Castleberry specifically testified that he would not have extended the loan to the Defendant had he known about the material misrepresentations contained within the Financial Statements.  The amount requested by the Defendant was less than what the Defendant explained was needed to complete the project, but – as Mr. Castleberry testified – the Financial Statements seemed to show that the difference could easily be made up with the Defendant's own assets.

Although the evidence and testimony offered do not indicate that the Financial Statements served as the sole basis for approving financing to the Defendant, it is clear that they were a major contributory factor. As the court explained in *McCarthy*, a creditor need not show that it relied exclusively on the writing in question, but instead must show that the writing was at least partially relied upon. 421 B.R. at 561.

### 2. Reasonable Reliance

The Court concludes that the Plaintiff's reliance on the Defendant's representations was reasonable. The Financial Statements are – objectively speaking – the type of document usually relied upon by creditors when deciding whether to extend financing to a borrower. *See e.g., Norris v. First Nat'l Bank (In re Norris),* 70 F.3d 27, 30 (5th Cir.1995); *In re Coston*, 991 F.2d at 259. The Defendant himself testified at trial that he was aware that the objective behind providing such information to the Plaintiff was so that the bank could reasonably assess whether he had the necessary assets to repay the loan.

From all appearances, the Defendant had very little in debt, and sufficient unencumbered assets to serve as future collateral if needed. A review of the Financial Statements does not reveal any sort of "red flags" which might cast the extension of credit as an unreasonable decision. Although the Financial Statements showed the Defendant as owning several large pieces of valuable property, that sort of property ownership would not have been unusual given his

15

line of work as a contractor and developer.  Furthermore, Mr. Castleberry testified that he had done business with the Defendant in the past and there were never any problems. Nothing in their past dealings gave the impression that Mr. Castleberry should have been suspicious or doubtful of the Defendant's truthfulness or honesty, or that he should doubt the veracity of the Financial Statements. *In re Phillips*, 367 B.R. 637, 645 (Bankr. C.D. Ill. 2007) (holding that "[w]here the debtor and the creditor have an ongoing relationship which has given rise to a relationship of trust, a creditor's reliance may be deemed reasonable without additional verification.").

At trial, Mr. Castleberry admitted that he did not conduct any research to verify the validity or accuracy of the Financial Statements.  However, courts have repeatedly held that a creditor's failure to verify financial statements – absent any "red flags" which should have made further investigation prudent – does not necessarily defeat reasonable reliance. *In re Contos*, 417 B.R. 557, 567 (Bankr. N.D. Ill. 2009) (finding that creditor-bank was "reasonably entitled to rely upon the financial information provided by the Debtors because it had no reason to suspect that the Debtors were providing false information.").

Considering the totality of the circumstances – the absence of questionable red flags, the parties' positive loan history, and the Defendant's apparently sound financial condition – this Court comes to the certain conclusion that the Plaintiff's actual reliance on the Financial Statements was reasonable.

### D. Causing to be Made or Published with Intent to Deceive

Lastly, a creditor seeking to nondischargeability must demonstrate that the debtor caused the statement to be published with intent to deceive.

#### 1. Published

As to the requirement that a debtor caused the financial statement to be made or published, "'published' is used in the same sense that it is used in defamation cases." S. REP. NO. 598, 9th Cong., 2d. Sess.78, (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5864.  That is to say, publication is the oral or written communication of the false information. *See, e.g., Blake v. Gannett Co.,* 529 So. 2d 595, 602 (Miss. 1988); *In re Perry*, 423 B.R. 215, 266-67 (Bankr. S.D. Tex. 2010) (holding that "[a] statement is published when it is said orally, put into writing or in print, and the statement was published in such a way that third parties are capable of understanding its defamatory nature.").   In the case at hand, the Defendant published the misstatements concerning his financial condition when he prepared and presented the Financial Statements to the Plaintiff.  That such publication was made is not in dispute.

#### 2. Intent to Deceive

"Whether a debtor in bankruptcy acted with the requisite 'intent to deceive' under § 523(a)(2)(B) is an issue of fact…" *In re Miller*, 39 F.3d 301, 304 (11th Cir. 1994).  As it is unlikely that an individual will freely admit to deceptive acts, the Fifth Circuit has held that deceit can be inferred from "reckless disregard for the

truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation." *Norris*, 70 F.3d at 30 n. 12 (citation omitted). "[A]n honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive." *Gen. Elec. Capital Corp. v. Acosta (In re Acosta),* 406 F.3d 367, 372 (5th Cir. 2005) (citing *Palmacci v. Umpierrez,* 121 F.3d 781, 788 (1st Cir. 1997)).

The Court concludes that the Defendant did not hold an honest belief that that information contained in the Financial Statements was accurate or true. The Defendant's own testimony revealed that the information and valuations contained in the Financial Statements were more than just optimistic exaggerations, but instead were outright fabrications. The Defendant could have no honest belief (reasonable or not) in the truth or accuracy of the representations, when, by the Defendant's own admissions, the assets and entities simply did not ever exist. The Court finds that such baseless exaggerations and fabrications amount to the sort of "reckless disregard for the truth" contemplated by the Fifth Circuit in *Norris.* 70 F.3d at 30 n. 12 (citation omitted).

Further, although the Defendant testified that he is not a financial expert, and that he made the best efforts possible given his lack of expertise, the Court finds that the Defendant had more than enough experience in these sorts of matters so that he was adequately aware of his actions and their ramifications. The Defendant has worked in the field of construction for decades. Both his

18

testimony and that of the Plaintiff's representatives paints a clear picture of the

Defendant's long history and substantial experience in obtaining financing for

construction projects. The Defendant's knowledge of construction matters is, in

fact, so extensive that the Defendant now serves as the supervisor for major

international construction projects.  The Defendant's own testimony confirmed his

familiarity with business transactions and the process of buying and selling real

property.  As such, there is no viable claim of ignorance in this situation.  The only

reasonable conclusion to be reached from an analysis of the Defendant's actions is

that he acted with intent to deceive.

### E. Damages and Attorney's Fees

The balance due on the Battleground and First and Second Waterloo Notes

has been conclusively determined through the First Adversary Proceeding. (A.P.

Case No. 12-01029).  At the start of this trial, the Court confirmed with the parties

that the amount of the debt was not still subject to litigation, as it had already

been established.  In the First Adversary Proceeding, the Honorable David W.

Houston, III, found that the Plaintiff was entitled to judgment in the amount of

$602,390.10 representing the balance due on the Battleground Loan, and

judgment in the amount of $231,954.19 representing the deficiency balance due on

the Waterloo Notes.  As of March 20, 2015, the updated payoffs were $285,789.66

on the Waterloo Property, and $ 474,170.94 on Battleground Plaza (following a

credit for the foreclosure proceeds).  With interest accrued since that day, the

Waterloo Property payoff is $288,061.62, and the Battleground Plaza payoff is $478,027.78.

The Fifth Circuit has held that "11 U.S.C. § 523(a)(2)(B) excepts from discharge the whole of any debt incurred by use of a fraudulent financial statement, and *such a debt includes state-approved contractually required attorney's fees*." *Matter of Luce*, 960 F.2d 1277, 1286 (5th Cir. 1992)(quoting *In re Martin*, 761 F.2d 1163, 1168 (6th Cir. 1985))(emphasis original). The Eighth Circuit Court of Appeals has similarly held that, "[a]ncillary obligations such as attorneys' fees and interest may attach to the primary debt; consequently, their status depends on that of the primary debt." *In re Hunter*, 771 F.2d 1126, 1131 (8th Cir. 1985). Accordingly, where a judgment is found to be nondischargeable pursuant to § 523(a)(2)(B), an auxiliary award of attorney fees in that judgment is likewise nondischargeable. *Klingman v. Levinson*, 831 F.2d 1292, 1296 (11th Cir. 1987); *see also Assoc. Growers, Inc. v. Horowitz (In Re Horowitz),* 103 B.R. 786, 790 (Bankr. N.D. Miss.1989) (holding that an award of fees and costs is only excepted from discharge to the extent those fees and costs arose from nondischargeable portion of the judgment).

The loan documents in this adversary proceeding provide for collection costs and attorney fees. The Court will review the fees and costs related to this adversary proceeding, the bankruptcy case, the state court litigation, the

foreclosures, and the out-of-court workout attempts for a determination as to the appropriate amount to be awarded.

## IV.  CONCLUSION

The Defendant's actions in the preparation and presentation of the Financial Statements are of the type contemplated by 11 U.S.C. § 523(a)(2)(B), and the debts arising there from should therefore be excepted from discharge.  The Defendant presented the Plaintiff with statements in writing, concerning his financial condition, which were materially false.  The Financial Statements contained not only baseless exaggerations of property values, but completely falsified information concerning assets that did not exist.  Further, the Court finds that, based on the totality of the circumstances, the Plaintiff both actually and reasonably relied on the Financial Statements.  There were no readily apparent "red flags" which should have given the Plaintiff cause for concern.  The Plaintiff's representative had a positive history of lending to the Defendant, and no circumstances or incidents during the time in question should have inspired suspicion that these transactions would be any different. Lastly, the Court finds that the Defendant unequivocally possessed the requisite intent to deceive when he prepared and presented the Financial Statements.  Stated concisely, there is simply no other explanation for the falsities contained in the documents. Accordingly, the Court finds that the debts in question are nondischargeable.

Although the Plaintiff also presented claims under 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6), because the debts are nondischargeable under (a)(2)(B), there is no need to explore the other claims.

**ORDERED, ADJUDGED** and **DECREED** that as of the date of this Order, the current balance of the Default Judgment is $766,089.48, representing the unpaid principal and accrued interest on the loans.  Interest shall continue to accrue as set forth in the Default Judgment.  It is further,

**ORDERED** that Plaintiff shall file an affidavit detailing all attorney's fees and costs within twenty-one (21) days.  The Defendant shall thereafter have twenty-one (21) days to file a response objecting to any charges.  The Court will then hold a hearing or enter a supplemental judgment for the fees and costs.  It is further,

**ORDERED** that both the Default Judgment and the supplemental judgment to be entered following determination of fees and costs shall be **NONDISCHARGEABLE**.

##END OF ORDER##